**Reversed and Remanded; Remittitur Suggested, and Opinion filed December 22, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00319-CV

---

### PNS STORES, INC., Appellant

### V.

### RENE MUNGUIA, Appellee

---

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2012-06825**

---

### O P I N I O N

Appellant PNS Stores, Inc., appeals from a final judgment awarding appellee Rene Munguia $1,048,500 in damages following a jury trial on Munguia's suit for injuries sustained when he was hit on the head by two bottles of deck wash that fell from a shelf at a Big Lots store where he was shopping with his son. PNS Stores, the lessee and operator of the store, contends that the trial court erred by excluding expert testimony and by denying its motion for new trial because the evidence is

legally and factually insufficient to support the damages awarded and the damages are excessive. Alternatively, PNS requests a suggestion of remittitur. Because the evidence is sufficient to support some, but not all, of the damages awarded, we suggest remittitur. If remittitur of the unsupported damages is timely filed, we will reform the trial court's judgment and affirm as modified. If it is not, we will reverse and remand the case for a new trial.

## Factual Background

On April 15, 2011, Munguia and his son, Rene Jr., went to a Big Lots store in Pasadena to buy a trash can for Rene Jr.'s apartment. While looking for the trash cans, Munguia saw several bottles on the floor of the aisle in which he and Rene Jr. were walking, and witnessed one or two more bottles fall from a shelf. The bottles were 32-ounce bottles of Deck Wash that fell from a top shelf about five feet high. There were no warning cones or signs on the aisle.

As Munguia neared the fallen bottles, a store employee named Merrill Northrup approached him from the other side of the aisle, where he had been stocking merchandise on the shelf behind the Deck Wash. Northrup seemed irate and uttered something like "nobody knows how to stock." Munguia reached down to help Northrup pick up the fallen bottles. As Munguia was standing up, two more bottles fell and hit him on the side of the head. Northrup acknowledged in a witness statement that he had knocked the Deck Wash off the shelf and it had hit Munguia.[1]

One of the bottles fell two to three feet and hit Munguia "square on the ear," sending him back down to one knee. Munguia was dazed and disoriented, but did

[1] Rene Jr. described the incident slightly differently, testifying that Northrup was on the adjacent aisle behind the Deck Wash when Munguia was hit, that Northrup seemed irate about something, and came around the aisle to apologize for the incident. Northrup did not testify at trial because he had passed away by that time.

not know how long he was down or whether he lost consciousness. Rene Jr. thought they should call an ambulance, but Munguia insisted he was fine. Munguia and Rene Jr. then left the aisle and walked to the front of the store to find a manager. After a few minutes, manager Lucas Robicheaux appeared. Robicheaux spoke with Munguia, Rene Jr., and Northrup, and prepared an incident report that included Northrup's statement. At trial, Robicheaux confirmed that the report correctly stated that Munguia's ear was red from the impact of the bottle of Deck Wash, and that Northrup was the stocker who had dislodged the bottles that fell from the top shelf of the aisle. He testified that Munguia was friendly and did not appear to be faking an injury.

Rene Jr. drove Munguia home. Munguia was nauseated and tried to rest. That evening, Munguia sought medical attention at a RediClinic in Pasadena for symptoms of nausea, weakness, tiredness, constant buzzing in his ears, and a sensitivity to light in his right eye. Although the RediClinic staff advised Munguia to go to an emergency room for further evaluation of his head trauma, Munguia instead went home.

But Munguia's symptoms persisted. On April 18, Munguia went to the emergency room at Memorial Hermann Hospital. There, Munguia was examined, given a CAT scan, and told that he more than likely had a concussion. He was instructed to rest for 7-10 days, and to see a specialist if his symptoms did not improve. Munguia's symptoms did not improve and he developed soreness and stiffness in his neck and shoulder. Munguia sought further treatment at Doctors Clinic, where he was prescribed physical therapy and exercises for the neck and shoulder problems. Although those ailments eventually became manageable for Munguia, the dizziness and ringing in his ears did not resolve and Munguia was advised to see a neurologist.

In August 2011, Munguia saw a neurologist, Dr. Djamchid Lotfi, because he was still suffering headaches, dizziness, weakness, ringing in his ears, and sensitivity to light. Dr. Lotfi believed that Munguia had suffered a closed head injury and had post-traumatic headaches and dizziness. He recommended Munguia have magnetic resonance imaging (MRI) and magnetic resonance angiography (MRA) testing of the brain and related circulatory systems. Dr. Lotfi also prescribed medications for Munguia, but could not tell him when or if he would ever recover. By the time of trial, Dr. Lotfi had treated Munguia for over two years but, except for the sensitivity to light, his symptoms continued. In addition, Munguia began having problems with memory loss and a decline in the quality of his life, including his ability to work as an actor and pursue his hobbies. Munguia's relationship with his wife was also negatively affected, as well as his interactions with his two grandchildren, which Munguia and his wife were raising.

In April 2013, Munguia was evaluated by a neuropsychologist, Dr. Richard Pollock. Dr. Pollock's area of expertise is in the diagnosis of cognitive and emotional impairments. Dr. Pollock's evaluation included an extensive interview and approximately 25 separate tests administered over the course of eight hours. While Munguia performed well on some of the tests, he performed poorly on others. Dr. Pollock diagnosed Munguia with a cognitive disorder, major depressive disorder, and organic brain injury, and concluded Munguia's condition was consistent with a concussion.

At trial, Dr. Pollock explained that, most of the time, the symptoms of concussion victims usually resolve within six months, but some require a longer recuperation period, and a small percentage of those people "have permanent residuals." Pollock also testified that, to a reasonable degree of neuropsychological probability, he believed the incident at the Big Lots store was the event that gave

rise to Munguia's acquired decreased mental functions.

PNS Stores presented the testimony of two medical experts to rebut the testimony of Munguia's treating physicians. The first, Dr. Stephen Croft, a board certified neurologist, performed an independent medical examination of Munguia. Dr. Croft opined that Munguia sustained a mild traumatic brain injury, but his symptoms would have resolved in a relatively short period of time and his current complaints were not related to the incident at Big Lots. Dr. Croft also opined that peripheral neuropathy, not the impact of the Deck Wash, was the cause of some of his symptoms. Next, Dr. William Daily, a neuropsychologist, disputed Dr. Pollock's interpretation of the results of his testing and his opinions. Dr. Dailey concluded that Munguia sustained a concussion or a mild traumatic brain injury and that he had recovered and did not suffer any cognitive dysfunction related to the incident at Big Lots.

Before PNS Stores called its liability expert, Rhonda Harper, Munguia's counsel objected to her qualifications and the foundation for her opinions. Outside the jury's presence, PNS Stores's counsel argued that Harper was qualified because of her education and industry experience in the marketing, display, and stocking of products in large, "big box" stores like Big Lots. PNS Stores's counsel also argued that Harper had a foundation for her opinions because she had viewed photographs of the Big Lots's display of the Deck Wash. After listening to the arguments of both counsel, the trial court sustained Munguia's objection. The trial court denied PNS Stores's request to voir dire Harper at that time, but offered PNS Stores's counsel an opportunity to show the court where in Harper's deposition she discussed her qualifications to opine on safety-related issues, either during or after the lunch break. Instead, after the charge conference, PNS Stores's counsel merely asked to have Harper's deposition included in the record "for appellate purposes."

5

The jury returned a verdict finding PNS Stores 90% liable and Munguia 10% liable. The jury awarded damages of $25,000 for past medical expenses, $150,000 for past physical pain and mental anguish, $520,000 for future physical pain and mental anguish, $50,000 for past physical impairment, and $420,000 for future physical impairment.

On January 31, 2014, the trial court signed a judgment for Munguia, after taking into consideration the proportionate responsibility of PNS Stores, in the amount of $1,048,500, plus pre- and post-judgment interest. PHS Stores filed a motion for new trial and, alternatively, suggestion of remittitur, which was overruled by operation of law. This appeal followed.

## PNS STORES'S ISSUES

On appeal, PNS Stores contends that the trial court erred by excluding the testimony of its liability expert and by denying its motion for new trial because the evidence is insufficient to support the awards of past medical expenses, past and future physical impairment, past physical pain and mental anguish, and future physical pain and mental anguish. PNS Stores also contends that the trial court should have granted its motion for new trial in the interest of justice and because the damages were excessive. Alternatively, PNS Stores contends that the trial court should have suggested a remittutur.

## Standards of Review

We review the denial of expert testimony and the trial court's failure to grant a motion for new trial for abuse of discretion. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996) (expert testimony); *Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 396 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (motion for new trial). The test for abuse of discretion is whether the trial court acted without

6

reference to any guiding rules or principles. *Broders*, 924 S.W.2d at 151. When the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, we apply the appropriate sufficiency standards to evaluate the trial court's denial of the motion. *Enright*, 330 S.W.3d at 396.

The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* at 827. Because jurors are the sole judges of the credibility of witnesses and may choose to believe one witness and disbelieve another, we must not substitute our opinion for that of the jury. *See id.* at 819. It is the role of the jury to resolve conflicts in the evidence; accordingly, we must review the evidence in a light favorable to the verdict and assume that jurors resolved all conflicts in accordance with that verdict. *Id.* at 820.

In evaluating a factual sufficiency challenge, we consider and weigh all the evidence in a neutral light and will set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). We also review the evidence for factual sufficiency when determining whether damages are excessive. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). The jury generally has great discretion in considering the evidence relevant to the issue of damages. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *City of Houston v. Howard*, 786 S.W.2d 391, 395 (Tex. App.—Houston [14th Dist.] 1990, writ denied).

## I.      Exclusion of Expert Testimony

PNS Stores first contends that trial court abused its discretion by excluding Harper's expert testimony. As an initial matter, Munguia contends that PNS Stores has waived this complaint because it failed to make an offer of proof as to the excluded testimony and therefore the issue is waived. *See* Tex. R. Evid. 103(a)(2).

### A.      Preservation of Error

Munguia contends that PNS Stores did not make an offer of proof to demonstrate what Harper would have testified to at trial. Instead, PNS Stores asked the trial court "admit just for purposes of the appellate record and not as evidence, the deposition . . . of Rhonda Harper and the exhibits to her deposition." Munguia did not object to this request, but argues that the deposition was not offered or admitted as evidence, and in any event, merely offering the entire deposition does not suffice as an offer of proof.

To adequately and effectively preserve error, an offer of proof must show the nature of the evidence specifically enough so that the reviewing court can determine its admissibility. *In re N.R.C.*, 94 S.W.3d 799, 806 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). The offer of proof may be made by counsel, who should reasonably and specifically summarize the evidence offered and state its relevance unless already apparent. *Id.* If counsel makes such an offer, he must describe the actual content of the testimony and not merely comment on the reasons for it. *Id.*

Here, the court questioned the parties at length concerning Harper's qualifications and the basis for her anticipated testimony. PNS Stores's counsel stated that Harper had a B.S. degree in mathematics and an M.B.A. from Emory University. Counsel argued Harper had significant experience with respect to

8

product display and marketing, and noted that Harper had firsthand stocking experience. According to counsel, Harper's experience included ensuring whether similar products in similar big box stores were displayed in a safe manner and at a safe level, whether warnings or barricades were needed during stocking, and whether stocking should be done at certain times of day. We conclude that PNS's attorney adequately summarized the substance of Harper's proposed testimony to preserve the issue for appeal. *See id.*

## B. The Trial Court Did Not Err by Excluding Harper's Testimony

Expert opinion testimony is admissible if the witness is qualified as an expert and the testimony will assist the trial of fact. *See* Tex. R. Evid. 702; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998). The offering party must demonstrate that the witness possess special knowledge as to the very matter on which he proposes to give an opinion. *Gammill*, 972 S.W.2d at 718. "Trial courts must 'ensur[e] that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion.'" *Id.* at 719 (quoting *Broders*, 924 S.W.2d at 152).

PNS Stores argues that Harper has extensive experience with the safety of product displays similar to those used in the Big Lots store which exceeds the experience of the average juror, and that she was familiar with the facts of the case from the testimony of the witnesses at trial and photos of the aisle. PNS Stores offered Harper as a "merchandise safety expert." The trial court concluded, however, that Harper's "expertise is in marketing and not safety" and that Harper lacked "the requisite education, training or experience in safety to testify in this case." The trial court also found that Harper was unqualified because she had not gone to the scene or done any tests, measurements, or physical examination of the aisle.

9

In addition to her education, Harper's curriculum vitae reflects that she has been, among other things, a marketing executive with extensive experience in merchandising and related disciplines. She also testified that she had worked as a stocker while in high school and college, and as an intern during graduate school. Harper opined that, based on the photographs she reviewed and her understanding of the incident, the display of Deck Wash and the height of the shelf on which the product was displayed was within industry standards and created no unreasonable risk of harm. She also opined that that an employee stocking a product does not pose a foreseeable risk to customers. However, neither Harper's resume nor her testimony reflects a particular expertise in safety that would have assisted the jury in this case.[2]

In her deposition, Harper explained that the industry standards she was familiar with involved the structural integrity and safety of the shelving unit design and ensuring that products are stocked facing forward within the boundaries of the space allotted. But Harper testified that she was unaware of any specific industry guidelines for stocking products safely. Instead, she believed that "from a common sensical point of view each and every person who's working in the [store] uses their own, you know, judgment in putting the stock on the shelf." Harper's opinion as to a matter of common sense would not have aided the jury in determining whether PNS Stores was negligent on the day Munguia was injured. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) ("When the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should

---

[2] Harper's CV describes her areas of expertise as "trademark infringement, patent infringement, brand management, defamation, contract breakage, advertising, consumer confusion, merchandising strategy, product sales losses, brand valuation, damage valuation, licensing, channel strategy, and sales strategy." Her CV does not reflect any training or expertise in any safety-related disciplines.

exclude the expert's testimony.").

Harper also testified that she had no opinion about the manner in which Northrup was stocking the products behind the Deck Wash and she did not know if he was following industry standards that day. Harper had not reviewed Big Lots's policies and procedures or its training manuals and did not know whether Big Lots had any policies and procedures for stocking or reorganizing shelves. In contrast, Robicheaux testified at trial that, consistent with Big Lots policy, stockers were specifically trained not to overfull shelves because of the risk that items could fall, and he acknowledged that one of the risks of an item falling of a shelf is that it could hit a customer.

Further, at the time of her deposition, Harper had no information about the incident other than what she had been told by PNS Stores's counsel. She did not visit the store to examine the scene, she did not talk to Munguia or read his or any other deposition, and she did not read Robicheaux's report made at the time of the incident. She also relied on pictures taken by PNS Stores's counsel apparently long after the incident, and had no idea whether those pictures depicted either the scene of the incident or its condition at the time of the incident.[3] On this record, we cannot say that the trial court abused its discretion by excluding Harper's testimony. *See K-Mart Corp.*, 24 S.W.3d at 360–61; *Gammill*, 972 S.W.2d at 718. We overrule PNS Stores's first issue.

---

[3] The photographs of the aisle and the shelf containing the Deck Wash were not offered or admitted at trial. PNS Stores argues that Robicheaux sufficiently authenticated them for purposes of Harper's opinion because he stated that they were "consistent" with his memory of how the Deck Wash was stocked at the time. However, Robicheaux also testified that he did not know who took the photos, when they were taken, or if they reflected the way the Deck Wash was stacked at the time Munguia approached the aisle. Additionally, Robicheaux confirmed that, in the photos, no Deck Wash was missing from the shelf.

11

## II.    Sufficiency of the Evidence of Past Medical Expenses

PNS Stores contends that the evidence is legally and factually insufficient to support the jury's award of past medical expenses of $25,000, because the evidence of Munguia's medical expenses from his treating physicians and healthcare providers as calculated from the billing records is $17,018.25. Because there is no evidence, or factually insufficient evidence, to support the amount awarded, PNS Stores argues that the trial court should have granted a new trial.

Munguia agrees the evidence does not support the  the  full  amount  awarded by the jury, but disagrees that a new trial is warranted on this basis. Instead, Munguia contends that this court may simply modify the trial court's judgment or suggest a remittitur. Munguia argues that the billing records in evidence prove past medical expenses of $21,018.25, and after adjusting for the amount of proportionate liability found by the jury, an award based on that amount would be $18,916.43.

A court of appeals may exercise its power to suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *see* Tex. R. App. P. 46.3. "If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987).

Based on the billing records in evidence, the evidence is legally and factually sufficient to support a lesser damages finding of $21,019.25, the highest

amount of actual damages supported by the evidence.[4] Adjusting for proportionate liability, the amount is $18,916.43. We therefore sustain PNS Stores's issues as to past medical expenses and suggest a remittitur of $3,583.57. If Munguia files a remittitur within twenty days from the date of this opinion, we will modify the trial court's judgment accordingly. If the remittitur is not timely filed, we will reverse the trial court's judgment and remand this case for a new trial. *See* Tex. R. App. P. 46.3.

## III. Past and Future Physical Impairment

PNS Stores contends that the evidence is legally and factually insufficient to support the awards for past physical impairment of $50,000 and future physical impairment of $420,000.

Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle. *See Enright*, 330 S.W.3d at 402; *Patlyek v. Britten*, 149 S.W.3d 781, 785 (Tex. App.—Austin 2004, pet. denied); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) ("Indeed, if other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life."). To receive physical impairment damages, the plaintiff must prove that (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements, and (2) these distinct injuries have had a "substantial"

---

[4] PNS Stores contends a new trial is required because it contested the amount and reasonableness of past medical expenses below, and notes that its expert, Dr. Croft, testified that Dr. Lotfi's charges were reasonable and necessary only up to six months after the injury. Adjusting for the difference, PNS Stores contends the total should be no more than $15,316.42. However, the jury rejected Dr. Croft's and PNS Stores's position that Munguia's continuing symptoms were not related to the incident at Big Lots. Moreover, PNS Stores's cited authorities do not address whether a remittitur would be inappropriate in this circumstance.

effect. *Enright*, 330 S.W.3d at 402.

PNS Stores argues that there is no evidence or factually insufficient evidence that Munguia's injuries prevented him from engaging in any physical activities or substantially affected him. PNS Stores asserts that Munguia's testimony showed that, after the incident, Munguia resumed working as an actor and had a role in a short film, was able to drive his car from Houston to San Antonio, and was able to help raise his two grandchildren. PNS Stores also argues that Munguia remains able to paint, although he now does so with a pallet knife rather than a brush, and Dr. Pollock told Munguia that he could work as an actor. PNS Stores also relies on Dr. Croft's and Dr. Dailey's opinions that Munguia's symptoms related to the incident would have resolved within a relatively short period, as well as Dr. Dailey's opinion that Munguia did not suffer any cognitive dysfunction related to the incident. Finally, PNS Stores argues that Munguia's complaints of headaches, dizziness, irritability, memory loss, and depression were compensable as pain and suffering and, therefore, awarding damages for physical impairment for the same symptoms results in a double recovery.

We begin with the contention that the jury's findings of past and future physical impairment are improper as awarding a double recovery. In the court's charge, the jury was not given a definition of physical impairment, but it was instructed to consider each element of damages separately, and not to award any sum of money on any element if it had otherwise, under some other element, awarded a sum of money for the same loss. The jury was then instructed "not to compensate twice for the same loss, if any." We therefore presume that the instructions were followed absent evidence otherwise. *See Golden Eagle Archery*, 116 S.W.3d at 771.

In support of its complaint that Munguia may not rely on the same

14

symptoms to recover for past and future physical impairment and pain and suffering, PNS Stores generally cites to *Peter v. Ogden Ground Servs., Inc.*, for the proposition that "intermediate appellate courts have shown extreme caution in reviewing claims for physical impairment because of a justified concern to prevent a double recovery." 915 S.W.2d 648, 650 (Tex. App.—Houston [14th Dist.] 1996, no writ) (quoting *Robinson v. Minick*, 755 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1988, writ denied)). We agree that caution is warranted, and note that our review of the evidence addresses this concern because it requires the plaintiff to prove that he incurred "injuries that are *distinct from*, or *extend beyond*, injuries compensable through other damage elements" and that these distinct injuries have had a substantial effect. *See Enright*, 330 S.W.3d at 402 (emphasis added).

Moreover, the focus of this element of damages is not the injuries or symptoms themselves, but whether they result in a substantial effect on the plaintiff's life activities or functions. *See Patlyek*, 149 S.W.3d at 787–88 (surveying examples of injuries or limitations that have been held to be legally sufficient evidence of physical impairment). As explained in *Patlyek*, "[b]y focusing on actual impediments to the plaintiffs' activities, a reviewing court can distinguish losses comprising physical impairment from the pain, suffering, inconvenience, or distress compensable in and of themselves through pain and suffering or mental anguish damages." *Id.* at 787. To make these determinations, Texas courts have looked to whether (1) impediments to the plaintiff's non-work related activities are obvious from the injury itself, or (2) the plaintiff produces some evidence of specific non-work related tasks or activities he can no longer perform. *Id.*

As of the time of trial, Munguia had suffered from headaches, dizziness, ringing in the ears, memory loss, confusion, disorientation, and inability to

concentrate for over two years.[5] The jury heard evidence that Munguia's impairments from his injury substantially affected his enjoyment of life in several ways. Dr. Lotfi initially found that Munguia was suffering from post-traumatic headaches and dizziness from a closed head injury. The MRI and MRA testing performed by Dr. Lotfi revealed that the injury to Munguia's right ear could have caused post-traumatic labyrinthitis, or damage to the part of the ear that controls balance. Dr. Lotfi diagnosed Munguia as suffering from vertigo, and confirmed that Munguia's symptoms of dizziness, problems with balance, and buzzing in the ear were consistent with labyrinthitis. Dr. Lotfi also opined that since the incident at Big Lots, Munguia not only had difficulties remembering his lines, which affected his ability to work as an actor, "there was [a] definite drop in his mental capacity and cognitive problems."

Additionally, the neuropsychological testing done by Dr. Pollack showed, among other things, that Munguia suffered declines in his IQ, reading skills, and math skills. Munguia performed poorly on several tests, including tests indicating a neuropsychological impairment or dysfunction of some kind and memory problems resulting in difficulty with the learning process. Munguia also demonstrated a severe impairment in deductive reasoning, which Dr. Pollock explained can cause patients to have "difficulty with structuring, planning, [and] sequencing events in their lives." Dr. Pollock further explained when patients with this problem are in unstructured situations, they "can get very confused and disoriented."

Munguia testified that, while he walked a mile or two every day before the incident, he could not do so after the incident, and if he was in the sun more than a

---

[5] After the incident, Munguia also suffered soreness and stiffness in his neck and shoulders, but those conditions became manageable with physical therapy and exercise. He also suffered from extreme sensitivity to light, which eventually resolved.

short while he would get terrible headaches and worsening buzzing in his ears. Munguia also testified that he was an artist and loved to paint, but he can no longer use a brush and must use a pallet knife because his hands shake and he cannot concentrate. Munguia also has difficulty carrying on conversations, reading, and driving. Munguia's wife testified that Munguia used to like to go fishing, but he has not gone fishing since the incident; she also testified that they rarely go out and no longer travel as they used to do. There was also testimony that Munguia's personality has changed from that of an optimistic and easygoing person to one who is easily agitated and irritated. As a result, Munguia sometimes has difficulty dealing with the grandchildren he and his wife are raising. He also has memory problems and difficulty concentrating. For example, Munguia's wife testified that when Munguia is driving, he will suddenly go the wrong way and become irritated. Rene Jr. also observed Munguia having issues with memory that had not occurred previously, recounting in particular an incident in which Munguia was making a purchase but was unable to calculate how to make the correct change for a $100 bill. And although Munguia was able to complete a small role in a film after the incident, learning his lines was much more difficult and he had trouble adapting to changes in the structure of the scene. Based on this evidence, the jury could have reasonably concluded that Munguia suffered from physical impairments that substantially affected him in the past.

The jury also could have concluded from the evidence that Munguia's physical impairments would continue to substantially affect him in the future. Munguia testified that some of his symptoms have worsened over time, and his wife likewise testified that his symptoms "progressively got worse" after the incident at Big Lots. Dr. Lotfi confirmed that the symptoms resulting from a mild traumatic brain injury can persist for months or even years. When asked why

Munguia was continuing to suffer from these symptoms so long after the incident, Lotfi explained:

> Well, this happens in cases of trauma mostly to the head. You enter into sort of a slippery slope. You have pain, you have not recovered, you become anxious, you become depressed, personality changes. We are talking about problems related to the frontal lobe, which is the lobe responsible for your personality. This causes anxiety, this causes, depression, it sets up a vicious cycle. People can get worse over the years instead of better.

Dr. Lotfi also explained that he could not answer with certainty how long Munguia would continue to suffer from his closed head injury.

> Q. [Munguia's counsel]: Is there any way to predict how long Mr. Munguia will suffer from his traumatic brain injuries?
>
> A. [Dr. Lotfi]: There isn't, really. Because no two people are exactly alike. As I explained before the break, there are people who have symptoms going on for months and years and a result of what appears to be trivial trauma. And then there are people who recover from significant brain injury. It depends on so many variable factors that you cannot in any individual case be absolutely dogmatic.

Similarly, Dr. Pollack explained that some concussion victims may have a longer recovery period than normal, and a smaller percentage can have "permanent residuals." Dr. Croft agreed that there are cases where symptoms persist for long periods of time, although he believed that Munguia's symptoms were persisting longer than they should have and were due to other factors in his life. And although Dr. Dailey thought Munguia's concussive symptoms should have resolved, he opined that Munguia was suffering from "persisting post-concussion syndrome." None of the experts believed that Munguia was faking or exaggerating the symptoms he described. Thus, the evidence was sufficient to enable the jury to find that, since the incident at Big Lots, Munguia has suffered from physical impairments that would persist well into the future.

18

Viewing the evidence in the light most favorable to the verdict, we conclude that legally sufficient evidence supports the jury's award of $50,000 for past physical impairment. Considering and weighing all the evidence in a neutral light, we also conclude that the evidence is factually sufficient to support the jury's award of $420,000 for future physical impairment. We overrule PNS Stores's issues as to past and future physical impairment.

## IV. Past and Future Physical Pain and Mental Anguish

PNS Stores next argues that the evidence is factually insufficient to support the awards of $150,000 for past physical pain and mental anguish and $520,000 for future physical pain and mental anguish. PNS Stores notes that Munguia was able to walk out of the Big Lots store within minutes after the bottle of Deck Wash hit him in the head, and although he testified that he had ringing in the ears, headaches, irritability, dizziness, and some memory loss, he also testified that he was able to drive and work as an actor in a theater production after the incident. Further, PNS Stores argues that the jury's award was not supported by factually sufficient evidence that Munguia had a high degree of mental pain and distress that was anything more than mere worry, anxiety, vexation, embarrassment, or anger. And, according to PNS Stores, neither Dr. Lotfi nor any other witness testified that Munguia's complaints would continue into the future.

Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). There must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). "Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and

19

severity of the mental anguish is required." *Serv. Corp. Int'l v. Guerra,* 348 S.W.3d 221, 231 (Tex. 2011). To support an award for future mental anguish, a plaintiff must demonstrate a reasonable probability that he would suffer compensable mental anguish in the future. *Adams v. YMCA of San Antonio,* 265 S.W.3d 915, 917 (Tex. 2008).

Plaintiffs may also recover for physical pain. *See Figueroa v. Davis,* 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Damages for future physical pain are recoverable if a jury could reasonably infer that the plaintiff will feel physical pain in the future. *See id.* at 63–64.

In personal injury cases, the jury has discretion over the amount of damages. *Howard,* 786 S.W.2d at 395. The process of awarding damages for amorphous, discretionary injuries such as physical pain and mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *HCRA of Tex., Inc., v. Johnston,* 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). Despite this broad discretion, however, there must be some evidence to justify the amount awarded, as a jury "cannot simply pick a number and put it in the blank." *Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex. 1996).

As discussed above, evidence was presented that, by the time of trial, Munguia has suffered physical pain in the form of, among other things, terrible headaches and ringing in his ears for over two and one-half years, severe pain in his right eye upon exposure to light, and soreness and stiffness in his neck and shoulder. That evidence is factually sufficient to support the jury's award without regard to mental anguish. Moreover, Munguia testified to past mental anguish in the form of fear and despair that, unlike his recovery from prior significant medical problems, he would not recover from this seemingly intractable problem. Munguia

also testified that his personality has changed for the worse; he sometimes becomes irritable, angry, and cries for no reason, and he is unable to shake off the negative feelings. Munguia's wife testified that Munguia is no longer upbeat and happy and "his heart is not in anything." To the extent necessary, then, this evidence is factually sufficient to support the finding of past mental anguish damages.

Likewise, the evidence is factually sufficient to support the jury's findings of future physical pain and mental anguish damages. The testimony demonstrated that Munguia had been in pain for more than two and one-half years, he had not improved, and had actually gotten worse. No witness testified that Munguia was faking or exaggerating his symptoms. Dr. Lotfi testified that he could not say with certainty exactly how long Munguia's injuries would last or predict with certainty whether they would be permanent. But no witness expressed doubt that Munguia would continue to suffer physical pain in the future, and the jury was free to consider the testimony of both the lay and expert witnesses, as well as Munguia's medical records in evidence, to determine that a reasonable probability existed that Munguia would continue to suffer physical pain in the future.

On this record, we cannot say that the jury's award of future physical pain and mental anguish is so against the great weight and preponderance of the evidence that it is manifestly unjust. *See Flynn v. Racicot*, No. 09-11-00607-CV, 2013 WL 476756, at *6 (Tex. App.—Beaumont Feb. 7, 2013, no pet.) (mem. op.) ("Evidence of continuing pain may support an award of future physical pain and future mental anguish."); *Wal-Mart Stores, Inc. v Ortiz*, No. 13-98-518-CV, 2000 WL 35729388, at *7–8 (Tex. App.—Corpus Christi Aug. 3, 2000, pet. denied) (not designated for publication) (evidence that plaintiff continued to have pain in her leg and trouble walking, among other things, held factually sufficient to support awards for future physical pain, mental anguish, and physical impairment).

Because the evidence is factually sufficient to support the awards of past and future physical pain and mental anguish, the trial court did not abuse its discretion by denying PNS Stores's motion for new trial on this basis. We overrule PNS Stores's issues as to past and future physical pain and mental anguish.

## V.     A New Trial "In the Interest of Justice"

PNS Stores contends that trial court should have granted a new trial in the interest of justice. According to PNS Stores, the jury's verdict assessing damages "fifty-eight times the amount of medical expenses" and nearly twice what Munguia requested was not based on the evidence, but was motivated by passion, bias, or prejudice. PNS Stores suggests that the incident was minor and also points to the testimony of its experts, Dr. Dailey and Dr. Croft, who testified that Munguia's symptoms should have resolved within months of the incident.

A trial court may, in its discretion, grant a new trial in the interest of justice, if the trial judge articulates understandable, reasonably specific, and legally appropriate reasons and the record supports the order. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 759–60 (Tex. 2013). But PNS Stores points to nothing that would require the trial court to do so in this case. PNS stores does not direct us to any authority requiring a direct correlation between the amount of medical expenses incurred and the amount of non-economic damages awarded. Nor does PNS point to any evidence that the jury was motivated by passion, bias, or prejudice. Indeed, the jury found Munguia 10% at fault for negligence in picking up the fallen bottles of Deck Wash. Moreover, the jury was entitled to credit the testimony of Munguia, Dr. Lotfi, and Dr. Pollack, and to discount the testimony of Drs. Croft and Dailey. *See McGalliard*, 722 S.W.2d at 697 (trier of fact may believe one witness and disbelieve another, and may accept lay testimony over that of experts). We therefore reject PNS Stores's contention that the trial

22

court should have granted a new trial in the interest of justice and overrule this issue.

## VI.   Excessive Damages or Remittitur

Lastly, PNS Stores contends that the trial court erred because it did not either grant a new trial because the damages were excessive or, alternatively, suggest a remittitur. PNS Stores contends the award is "grossly excessive" because the jury awarded more damages for past medical expenses than Munguia proved, and the total amount awarded was nearly twice what counsel requested in closing argument. According to PNS Stores, this demonstrates that "the verdict was not based on reason and evidence, but on passion and prejudice." Further, PNS Stores argues that the size of the verdict alone establishes prejudice and passion as a matter of law because it is "so flagrantly excessive that it cannot be accounted for on any other ground." *See World Oil Co. v. Hicks*, 103 S.W.2d 962, 964 (Tex. 1937).

Courts have recognized that a jury "is not tied to awarding damages exactly as requested by the injured party." *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 606 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000)). A jury may award more damages than requested if there is evidence supporting the higher award, *Zimlich*, 29 S.W.3d at 73, and we have determined that the evidence is factually sufficient to support the non-economic damages awarded. Because factually sufficient evidence supports the jury's awards for past physical impairment, future physical impairment, past physical pain and mental anguish, and future physical pain and mental anguish, the trial court did not err by refusing to grant a new trial or order a remittitur of those damages. Moreover, because there was evidence to account for the jury's large verdict, we cannot say that the verdict was "so flagrantly excessive

23

that it cannot be accounted for on any other ground." *See Casas v. Paradez*, 267 S.W.3d 170, 191 (Tex. App.—San Antonio 2008, pet. denied) (holding jury's verdict was not excessive when factually sufficient evidence supported jury's verdict). We overrule PNS Stores's last issue.

## CONCLUSION

We overrule PNS Stores's issues one, three, four, five, and six, and hold that the evidence is legally and factually sufficient to support the portion of the judgment awarding Munguia damages for past physical impairment, future physical impairment, past physical pain and mental anguish, and future physical pain and mental anguish. However, we hold that the evidence of past medical expenses is legally and factually insufficient and therefore sustain issue two in part and suggest a remittitur of $3,583.57. Munguia has twenty days from the date of this opinion to accept the remittitur. If accepted, we will reform the trial court's judgment and affirm as modified. If remittitur is not filed within twenty days of this opinion, we will reverse and remand this cause for a new trial.


/s/    Ken Wise
Justice


Panel consists of Justices Christopher, Donovan, and Wise.